JUDY B. and Debra T., Individually and on Behalf of All Individuals Similarly Situated, Plaintiffs,

v.

BOROUGH OF TIOGA, The Zoning Hearing Board of the Borough of Tioga, and Curtis Osterhoudt, Individually and in his Official Capacity as Mayor of the Borough of Tioga, and his Agents, Assigns and Successors in Office, Defendants.

No. 4:CV–95–0354.

United States District Court, M.D. Pennsylvania.

June 19, 1995.

Robert Meek, Mary Catherine Roper, Disabilities Law Project, Philadelphia, PA, Thomas A. Walrath, Wellsboro, PA, for plaintiffs.

Jeffrey S. Loomis, Wellsboro, PA, Harry Thomas Coleman, W.C. Carter Building, Scranton, PA, for defendants.

## MEMORANDUM

McCLURE, District Judge.

Plaintiffs Judy B. and Debra T. filed this action to contest a decision by the Zoning Hearing Board for the Borough of Tioga, Pennsylvania as inconsistent with the federal Fair Housing Amendments Act of 1988 (FHAA), 42 U.S.C. §§ 3601–3631. Plaintiffs bring this action on their own behalf and on behalf of other Tioga County residents similarly situated who have a disability and are without a permanent or long-term residence.[1]

United Christian Ministries (UCM) has contracted to purchase a property in the Borough of Tioga (the borough) formerly operated as the Seven Dwarfs Motel (the motel). UCM plans to convert the motel into a single room occupancy (SRO) residence for individuals such as the plaintiffs as a facility where they could live semi-independent lives, and with counseling and support, acquire the life-skills, coping mechanisms and confidence they need to live on their own as productive members of society.

The district in which the motel is located is zoned CI Restricted Commercial/Industrial under section 165-19 of the Tioga Borough Zoning Ordinance, Ordinance No. 118 (Nov. 5, 1973) codified as Chapter 165 of the Code of the Borough of Tioga.[2] The zoning enforcement officer interpreted the ordinance as requiring UCM to obtain a use variance in order to qualify for a building permit. UCM's variance application was denied by the Tioga Zoning Borough Hearing Board on May 3, 1994 on the ground that it had not made a sufficient showing of hardship. The denial was affirmed by the Court of Common Pleas of Tioga County on September 12, 1994. Subsequent requests by UCM to the Zoning Hearing Board for a waiver of the variance requirement as a "reasonable accommodation" mandated by the FHAA were unsuccessful.

Plaintiffs then filed this action seeking, inter alia, an injunction[3] from this court mandating issuance of the permit necessary to allow UCM to use the motel as proposed.

---

1. Although the complaint bears the heading "Class Action," and includes allegations to that effect, no motion for class certification was filed until June 12, 1995 (record document no. 31). No class having been certified, this action is not, at this time, governed by the procedural requirements applicable to such actions, set forth at Fed.R.Civ.P. 23.

2. Excerpts from the borough zoning ordinance are reproduced at record document no. 21. The entire zoning code is reproduced at record document no. 24 as exhibit "A".

3. Record document no. 7.

Plaintiffs' complaint alleges a cause of action under the FHAA on two grounds: 1) failure to waive the variance requirement as a "reasonable accommodation" to handicapped persons under the FHAA, 42 U.S.C. § 3604(f)(3)(B); and 2) unlawful interference by defendant Osterhoudt, the Mayor of Tioga, based on his alleged solicitation of citizen opposition to the proposed SRO residence.

A hearing on plaintiff's motion [4] for a preliminary injunction was held on May 31, 1995. Five witnesses testified for the plaintiffs: Reverend Virginia Boley, Executive Director of UCM; co-plaintiffs Judy B. and Debra T.; Michael Egan, Executive Director of the Tioga County Redevelopment Authority; and Walter Gray Smith. Smith testified as an expert on zoning and planning issues. Charles LaVancher testified for the defendants.

Based on the evidence presented at the May 31, 1995 hearing and the arguments made by counsel in briefs and during oral argument, this court will grant plaintiffs' motion for injunctive relief. Defendants' motion to dismiss the complaint will be denied. Plaintiffs' request for attorneys' fees pursuant to 42 U.C.S. § 1988 will be considered at a later date.

## DISCUSSION

### FINDINGS OF FACT

Based on the testimony presented and the documentary evidence introduced at the May 31, 1995 hearing, the court makes the following findings of fact:

#### The Parties

1. Plaintiff Judy B. is resident of Tioga County, Pennsylvania.

2. Plaintiff Debra T. is resident of Tioga County, Pennsylvania.

3. The Borough of Tioga (the borough) is a Pennsylvania municipal corporation located in Tioga County.

4. The Zoning Hearing Board of the Borough of Tioga is the body charged with certain zoning-related duties including the granting of variances under the Tioga Borough zoning ordinance in accordance with the applicable provisions of the Pennsylvania Municipalities Planning Code, 53 Pa.Stat. Ann. tit. 53, §§ 10901–10916.

5. Defendant Curtis Osterhoudt is the Mayor of the Borough of Tioga.

#### The Osceola Shelter

6. United Christian Ministries (UCM) is a Pennsylvania non-profit corporation with offices at Main Street, Osceola, Tioga County, Pennsylvania dedicated to providing services to the poor and disadvantaged of Tioga County. UCM currently operates in Osceola a shelter (Osceola shelter) for the homeless, many of whom are recovering alcoholics, drugs addicts, or suffer from a mental or physical disability which hinders their ability to live independently. UCM also operates a food bank from the Osceola site. The Reverend Virginia Boley is the Executive Director of UCM and was the guiding force in its development.

7. The Osceola shelter is located in a converted house and has space for up to twelve occupants, if occupants are housed two to a room. All occupants share a single bathroom and a single kitchen and have counseling and support services available to them around-the-clock. Privacy is at a premium since space is limited.

8. Residents cannot lock their individual rooms and can have overnight guests only to a very limited degree. These restrictions impact the lives of those who reside there, particularly those who have minor children.

9. Demand for rooms at the shelter far exceeds available space. The Osceola shelter has been filled to capacity since it opened, and there is always a waiting list.

10. Operation of the shelter is funded by contributions and grants from government and private sources.

11. The Osceola shelter was originally intended to serve as an emergency shelter, with residents staying only a few days until they could obtain housing elsewhere. Circumstances have altered the original plan. Most residents extend their stay for months or even years due to: the lack of affordable

---

**4.** Record document no. 7.

housing; their limited incomes and their inability to move from a communal-type living arrangement to total independence without an interim step. There is currently no facility in Tioga County where shelter residents can gradually learn to cope with their disabilities and gain skills necessary to live responsibly and productively on their own.

12. Perceiving the need for such a transitional shelter, UCM decided to establish the proposed facility in Tioga Borough. The motel was selected because it was the most suitable property on the market at that time. Reverend Boley looked at several residential properties on the market, but found them too small for the proposed facility. The motel has 11 individual units—each consisting of a room and a bath. The property also contains a four-room house and a garage. (Hearing exhibit P-1)

13. UCM plans to remodel the motel into a fifteen unit single room occupancy (SRO) shelter. Its plan will not require substantial structural alterations. The eleven motel units, each of which already has an adjoining bath, and four rooms in the house, which will have private baths added, will comprise the fifteen individual rooms. The garage is to be used as a learning center where classes and counseling services will be made available to residents. All occupants will share kitchen facilities. A food bank will also operate from the site. The additional space will allow UCM to provide services to residents currently not available elsewhere in Tioga County.

### Acquisition of the motel property

14. UCM entered into an agreement of sale on December 8, 1994 to purchase the motel property for $155,000.00. Closing is contingent on UCM's obtaining zoning approvals and financing. The closing must take place on or before July 30, 1995, and is contingent upon UCM's obtaining a grant and/or low interest loan and the necessary zoning approvals and on other conditions unrelated to this action. (Hearing exhibit P-1)

15. UCM has obtained commitments from private and governmental sources to fund the purchase of the property and the mortgage payments. Both sources of funding are contingent upon UCM's ability to obtain necessary zoning approvals. Both commitments will expire if such approvals are not obtained by a specified date. UCM's mortgage commitment expires July 30, 1995. (Hearing exhibit P-1) Tax credits are also part of the financing package.

16. UCM has succeeded in qualifying shelter residents for Section 8 rental assistance payments from the United States Department of Housing and Urban Development (HUD). The section 8 payments will be used to pay off the mortgages. Without section 8 funding, UCM cannot guarantee repayment of the mortgage.

17. If the necessary zoning approvals and other contingencies are not satisfied by a specified date, HUD will recapture, i.e. reallocate, the section 8 funds currently allocated to residents of the proposed shelter.

18. UCM has received one extension from HUD to obtain the necessary project approvals, but has been notified that no further extensions will be given. If UCM loses the promised section 8 funding, it can reapply, but has no guarantee that its application will be granted. A previous application for section 8 funding for this project was denied. The project cannot go forward without section 8 funding.

### Plaintiffs Judy B. and Debra T.

19. Both plaintiffs are long-term residents of the Osceola shelter.

20. Plaintiff Debra T. is a recovering alcoholic who has lived at the Osceola shelter on two separate occasions. She lived there for two months during 1993 and for several months earlier this year. On both occasions, she moved into the shelter after competing a residential rehabilitation program for alcoholism. She moved out on her own in 1993, was successful for a time in living on her own, but ultimately relapsed and entered a rehabilitation program for alcoholism. After completing that program, she moved into the Osceola shelter for the second time. She moved out to resume life on her own in April, 1995 and has, so far, been doing well. A facility such as the proposed Tioga SRO residence would have eased her transition into independent living and increased the odds of

her succeeding and avoiding a second relapse.

21. Plaintiff Judy B. suffers from bipolar personality disorder with recurring depression and, with the exception of a short period in 1994, has resided continuously at the shelter since July, 1993. She receives counseling and attends support groups and could benefit greatly from an opportunity to reside in a setting where she has more privacy and more control over her life with available counseling and continuing support services as a transition from communal living to independent living.

22. During the period when she was not residing at the Osceola shelter, Judy B. made an unsuccessful attempt to live on her own. She left the shelter in January, 1994, was hospitalized shortly thereafter, and returned to the shelter in February, 1994, where she has resided ever since. Due to the lack of support services, she was unable to make the transfer from living communal-style to living on her own. Judy B. has valid concerns that a future attempt to make that transition may be equally doomed unless she can avail herself of a transitional facility which can offer her a more independent life-style, with support services available should she need them. The proposed Tioga SRO residence will be such a facility. If UCM is successful in its efforts to establish such a facility, Judy B. will reside there.

23. Plaintiffs Judy B. and Debra T. are typical of individuals currently residing at the Osceola shelter and are representative of those individuals who would avail themselves of the services provided by the proposed Tioga shelter.

**Motel zoning**

24. The motel is located at 2 Berry Street in Tioga in a district zoned CI Restricted Commercial/Industrial (CI district). The property is located on a well-traveled street.

25. A motel was operated on the site prior to the enactment of the borough zoning ordinance classifying the district as CI Restricted Commercial/Industrial.

26. Within a few blocks of the motel, there currently exist: residential properties, a box factory, a ball field, and various shops and businesses.

27. The CI District is gerrymandered to incorporate the motel within its boundaries. Had the district lines followed borough streets along straight lines, the motel site would have been included within the neighboring R–2 Medium Density Residential District (R–2 District). The motel is surrounded on three sides by the R–2 District and on the fourth by the CI District.

28. Permissible uses in the CI District include: retail sales, professional or business offices, barber shops, commercial education facilities, restaurants, medical research laboratories, manufacturing concerns, printing or publishing businesses and wholesale or retail sale establishments. Residences such as the proposed UCM transitional shelter are not expressly listed as permissible uses.

29. Motels are not among the permitted uses specifically listed. While it was in operation, the motel operated either as a nonconforming use or as a permitted use "similar in character" to the listed uses.

30. Nowhere in the borough does there currently exist a district in which UCM's proposed SRO residence could exist without first obtaining prior approval from the Zoning Hearing Board.

31. On February 25, 1994, UCM applied for a variance to renovate the motel into a long-term shelter. A public hearing on its application was held on March 24, 1994.

32. UCM's application was denied by the Tioga Zoning Hearing Board on May 3, 1994 on the grounds that UCM had not established the requisite economic hardship to justify grant of the variance. UCM appealed the denial, but the Zoning Hearing Board's decision was affirmed by the Court of Common Pleas of Tioga County, Pennsylvania in an order dated September 12, 1994. No further appeal was taken.

**Proposed SRO residence**

33. UCM proposes to convert the motel into a single room occupancy living facility for disadvantaged persons. Use of the motel as an SRO residence is consistent with the character of the surrounding neighborhood.

It will not fundamentally alter the borough zoning scheme, nor will it adversely impact neighboring property owners.

34.  The SRO residence will generate far less traffic and far fewer parking problems than would a commercial use such as a shop, a motel or a restaurant.

35.  Without such facilities and the opportunity they offer for shelter residents to make a gradual transition from communal-type living to private housing, such individuals frequently have extreme difficulty making the transition successfully and not infrequently again become homeless or revert to their former problems.

36.  The motel property is uniquely suited to UCM's requirements.  Its current configuration lends itself to conversion into an SRO residence more readily than would a single family dwelling or other similar structure and will require fewer structural modifications.

37.  Of the properties which Reverend Boley was shown by the realtor, the motel was the one best suited to UCM's needs.

38.  Defendants have not demonstrated the availability of any other properties within UCM's service area, i.e. Tioga County, suitable for the proposed SRO residence without the need for substantial structural alterations.

39.  If granted zoning approval, UCM would renovate the buildings currently on the premises to accommodate 15 single room occupancy units, each with a private bath. The garage would be converted into an activity center.  All occupants would share kitchen facilities.

40.  The proposed SRO facility would be staffed around-the-clock with a supervisor or counselor available to the occupants at all times for counseling or assistance.

41.  UCM's objective in operating the shelter would be to provide disadvantaged persons with a facility where they can, with assistance, learn to cope with their problems and acquire the skills necessary to live productively on their own.

42.  The facility would serve as an interim step between short-term "emergency" type shelters, where stays are typically limited to days or weeks and privacy is at a premium, and independent living in private housing.

43.  Such a facility and the services and assistance it would offer are needed by most individuals in plaintiffs' situations to successfully make the transition from homelessness compounded by drug or alcohol addiction or mental or physical disability, to living independently in private housing.  Providing such individuals with a measure of independence helps them to develop a sense of responsibility and self-esteem, important milestones on the road to a fully independent life.

## LEGAL ISSUES

### Standing

■  To establish standing plaintiffs must show they: 1) suffered an "injury in fact" that is concrete and particularized, and actual or imminent, not conjectural or hypothetical; 2) that the injury is fairly traceable to the challenged action; and 3) it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) and *Horizon House Developmental Services, Inc. v. Township of Upper Southampton,* 804 F.Supp. 683, 691 (E.D.Pa.1992). Both plaintiffs have satisfied this test.

■  UCM is not a named plaintiff to this action but would also have standing to challenge the refusal to grant a variance or waive the variance requirement as an FHAA violation.  Federal courts have held that a person who is not himself handicapped, but who is prevented from providing housing for handicapped persons by a municipality's discriminatory acts, has standing to sue under the FHAA.  See, e.g., *Baxter v. Belleville,* 720 F.Supp. 720, 730–31 (S.D.Ill.1989) and *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 1120–21, 71 L.Ed.2d 214 (1982) (FHA Case) and *Gladstone, Realtors v. Bellwood,* 441 U.S. 91, 103 n. 9, 109, 99 S.Ct. 1601, 1609 n. 9, 1612, 60 L.Ed.2d 66 (1979) (community was affected by alleged racial steering).

### Standards for preliminary injunctive relief

■  As the party seeking preliminary injunctive relief, the plaintiffs bear the burden

of proof. In deciding whether an injunction should issue, the court must carefully weigh four factors: 1) whether the movant has demonstrated a reasonable probability of success on the merits; 2) whether the movant will suffer irreparable injury if the injunction does not issue; 3) whether granting the injunction will result in even greater harm to the nonmoving party; and 4) whether granting the injunction serves the public interest. *Gerardi v. Pelullo,* 16 F.3d 1363, 1373 (3d Cir.1994).

■ Irreparable harm and likelihood of success on the merits are essential elements. Absent a showing of either one, the petitioner is not entitled to injunctive relief. To prove irreparable harm, the petitioner must show that the harm threatened by the defendant's conduct cannot be compensated by money damages. If the threatened harm is compensable with monetary damages, the petitioner has not demonstrated irreparable harm and is not entitled to a preliminary injunction. *Frank's GMC Truck Center, Inc. v. G.M.C.,* 847 F.2d 100, 102–03 (3d Cir.1988).

### Likelihood of success on the merits

To establish a likelihood of success on the merits, plaintiffs must demonstrate that the Zoning Hearing Board's denial of UCM's request for a variance violates the FHAA, as alleged.

The Fair Housing Act (FHA) enacted by Congress in 1968, 42 U.S.C. § 3601–3631, makes it illegal to discriminate on the basis of race or national origin in housing practices and grants "aggrieved persons" the right to challenge such practices in federal court. 42 U.S.C. § 3613(a). Injunctive relief is among

the remedies available to such persons. 42 U.S.C. § 3613(c).

The FHA defines an "aggrieved person" to include any person who—"1) claims to have been injured by a discriminatory housing practice; or 2) believes that such person will be injured by a discriminatory housing practice that is about to occur." 42 U.S.C. § 3602(i).

With the enactment of the Fair Housing Amendments Act (FHAA) in 1988, Congress amended the FHA to expand its anti-discrimination protections to include the handicapped. The FHAA defines a "handicap" as:

1) a physical or mental impairment which substantially limits one or more of such person's major life activities,

2) a record of having such an impairment, or

3) being regarded as having such an impairment, but such term does not include current, illegal use of or addiction to a controlled substance.

42 U.S.C. § 3602(h). This definition has been interpreted to include persons with a mental illness or personality disorder, recovering alcoholics and drug addicts.[5] *Oxford House, Inc. v. Township of Cherry Hill,* 799 F.Supp. 450, 458–59 (D.N.J.1992) *(Oxford–Cherry Hill).*

Section 42 U.S.C. § 3604(f) defines unlawful discrimination against the handicapped to include the:

.... refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling.

5. This interpretation is supported by the legislative history of the FHAA, in which the following excerpt appears:

[I]ndividuals who have a record of drug use or addiction but who are not currently using illegal drugs would continue to be protected if they fell under the definition of handicap.... Just like any other person with a disability, such as cancer or tuberculosis, former drug-dependent persons do not pose a threat to a dwelling or its inhabitants simply on the basis of status. Depriving such individuals of housing, or evicting them, would constitute irrational discrimination that may seriously jeopardize their continued recovery.

H.R.Rep. No. 711, 100th Cong., 2d Sess. 22 (1988), reprinted in 1988 U.S.Code Cong. & Admin.News 2173, 2183.

It is consistent with the regulations promulgated by the HUD under the FHAA, which provide that:

The term physical or mental impairment includes, but is not limited to, such diseases and conditions as ... drug addiction (other than addiction caused by current, illegal use of a controlled substance) and alcoholism.

24 CFR § 100.201(a)(2).

42 U.S.C. § 3604(f)(3)(B). Congress borrowed this language from case law interpreting section 504 of the Rehabilitation Act, See: *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), an indication that it intended that line of cases to supply the governing standard in FHAA cases for determining what accommodations are reasonable. *Oxford–Cherry Hill,* 799 F.Supp. at 461.

■ Under the Supreme Court holding in *Davis* and its progeny, an accommodation is unreasonable if it either imposes "undue financial and administrative burdens," *Id.* at 412, or requires a "fundamental alteration in the nature of a program," *Id.* at 410, See also: *Alexander v. Choate,* 469 U.S. 287, 300 n. 20, 105 S.Ct. 712, 720 n. 20, 83 L.Ed.2d 661 (1985) and *Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1384 (3d Cir. 1991). Federal courts have applied the *Davis* standard in deciding FHA reasonable accommodation claims. See: *United States of America v. City of Taylor,* 13 F.3d 920, 930 (6th Cir.1993) (citing cases holding that refusal to grant the requested reasonable accommodation violates the FHAA if it would "impose no undue hardship upon the municipality."); *United States v. Village of Marshall,* 787 F.Supp. 872, 878 (W.D.Wis.1991) (accommodation is unreasonable if it "undermine[s] the basic purpose which the requirement seeks to achieve"); *Oxford House–Evergreen v. City of Plainfield,* 769 F.Supp. 1329, 1344 (D.N.J.1991) *Oxford–Plainfield,* (accommodation reasonable where it "would not cause undue financial burden to the City").

■ Municipal zoning ordinances are subject to the FHAA "reasonable accommodation" requirement. *Town of Huntington v. Huntington Branch, National Association for the Advancement of Colored People,* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988) (per curiam). Under it, municipalities are required to make "reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42

U.S.C. § 3604(f)(3)(B). This encompasses an obligation:

> to change rules or practices if they are necessary to allow a person with a disability an opportunity to live in the community: 'The concept of "reasonable accommodation" has a long history in regulations and case law dealing with discrimination on the basis of handicap. A discriminatory rule, policy, practice or service is not defensible simply because that is the manner in which such rule or practice has traditionally been constituted. This section would require that changes be made to such traditional rules or practices if necessary to permit a person with handicaps an equal opportunity to use and enjoy a dwelling.'

*Horizon House,* 804 F.Supp. at 699, citing 1988 Acts, House Report No. 100–711, at 25 and *Nathanson,* 926 F.2d at 1384–85.

■ Applying this standard to the facts before us, we finding nothing in the record which suggests that requiring defendants to allow the proposed use would impose "undue financial and administrative burdens," or require a "fundamental alteration in the nature of a program." *Davis,* 442 U.S. at 412 and 410, 99 S.Ct. at 2370 and 2369. See also: *Oxford–Cherry Hill,* 799 F.Supp. at 462. Compare: *United States v. City of Taylor,* 13 F.3d at 933 (Sixth Circuit reversed the district court holding that the city had refused to make reasonable accommodations because it would not issue a letter permitting the proposed use and remanded the case "for a determination of whether reasonable accommodation under the FHAA requires that Taylor spot zone or amend its neutral zoning ordinance to provide for AFC [Adult Foster Care] homes with more than six residents"); *Oxford–Plainfield,* 769 F.Supp. at 1344 (on preliminary injunction motion, municipality's refusal to grant zoning approval for Oxford House in single family zone showed violation of FHA).

Upon reviewing the ordinance,[6] we further conclude that the issuance of a building permit to UCM for the proposed use of the motel would require an extremely modest accommodation in the zoning rules of the borough. Although the Zoning Hearing

---

**6.** See: record document no. 24, exhibit "A," § 165–19.

Board and the Court of Common Pleas ruled otherwise, it would not be unreasonable to view the proposed use as "similar in character" to the uses expressly permitted in the CI District. The introductory paragraph to section 165–19 provides that the purpose of the CI District is "to provide for mixed development of heavy commercial and light industrial uses which will not adversely affect residential development." Section 165–19 then lists the "principal permitted uses," including such things as: retail establishments for the sale of food, beverages, apparel, furnishings and other consumer goods or building materials; "any professional or business office, studio, bank or other financial institution;" "personal convenience services" such as drycleaning services; restaurants; manufacturing, printing or storage facilities; and, most important for our purposes, "[o]ther uses which shall be similar in character to those listed above as shall be determined by the Zoning Hearing Board."

The proposed use of the motel as an SRO residence is certainly consistent with the character of the surrounding neighborhood. It will not fundamentally alter the borough zoning scheme. Nor will it adversely impact neighboring property owners. If anything, it will subject the neighborhood to less traffic, fewer parking problems and fewer disruptions to the neighborhood that any or all of the uses specially referred to. See generally: *Oxford House v. Town of Babylon,* 819 F.Supp. 1179, 1186 (E.D.N.Y.1993) (*Oxford–Babylon* ) and *Oxford–Cherry Hill,* 799 F.Supp. at 462.

Finally, it is relevant to note that the borough ordinance itself expressly recognizes the compatibility between uses permitted within the CI District and residential uses. Section 165–19(A) provides that: "The intent of the CI District is to provide for mixed development of heavy commercial and light industrial uses which will not adversely affect residential development."

Defendants would appear to suggest that the SRO belongs in a residential neighborhood. That argument is undercut by the motel's location directly on the border between the CI District and the R–2 District. As we stated in our findings, the motel is surrounded on three sides by residential properties. Its use as a long-term residence would, therefore, be consistent with the uses of neighboring properties.

■ Finally, to the extent that defendants are contending that the motel does not qualify for FHAA coverage because it is not a dwelling at this time, we reject that argument as inconsistent with clear authority on the issue. The proposed use is a dwelling, and that qualifies it for FHAA coverage. See, e.g., *Baxter v. City of Belleville,* 720 F.Supp. 720, 731 (S.D.Ill.1989) (former office building in the process of being converted to hospice for homeless persons who are HIV+ qualified for FHA coverage).

### Plaintiffs' showing of irreparable harm

■ In reviewing alleged FHA or FHAA violations, some federal courts have taken the position that a showing of a substantial likelihood that a defendant has violated the FHA is, by itself, sufficient to create a presumption of irreparable harm, which shifts the burden to defendant to prove that any injury that may occur is not irreparable. See, e.g., *Gresham v. Windrush Partners, Ltd.,* 730 F.2d 1417, 1423–24 (11th Cir.1984), *cert. denied,* 469 U.S. 882, 105 S.Ct. 249, 83 L.Ed.2d 187 (1984). It is not clear that those precedents would be followed by the Third Circuit, Compare: *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 803 (3d Cir.1989) and *Gov't of Virgin Islands Dep't of Conservation & Cultural Affairs v. Virgin Islands Paving, Inc.,* 714 F.2d 283, 286 (3d Cir.1983), so we will require a showing of irreparable harm.

Under the standard test for issuance of a preliminary injunction, "[t]he relevant inquiry is whether the movant is in danger of suffering irreparable harm at the time the preliminary injunction is to be issued." *SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1264 (3d Cir.1985).

Plaintiff Judy B.'s ability to show irreparable harm is stronger than that of her co-plaintiff. Plaintiff Debra T. has left the Osceola shelter, hopefully not to return, and reembarked on her own life.

Judy B.'s fate remains, however, directly tied to the fate of the proposed shelter. If UCM fails in its efforts to open the new shelter, she will, in all likelihood, continue to reside at the Osceola shelter, unable to take the next step toward an independent life. Her life will continue to remain in limbo pending availability of a suitable next-stage shelter into which she can relocate.

Her fate is, therefore, the fate of the proposed shelter. If UCM does not receive zoning clearance within the next month, it will lose funding for the project. It would then be required to begin anew its efforts to establish such a shelter, by attempting to find another property in Tioga County suited to its needs within its price range. That will be a significant undertaking. It has already taken UCM more than a year to get this far along in the process of attempting to establish the shelter in the borough. Requiring it to start the process anew will undoubtedly delay the completion of the shelter for up to a year, if not much longer. Further, due to the tenuous nature of the funding package it has managed to establish, there is no guarantee that, in fact, it will be able to put together the same package in the future. If the project does not go through at this time, it may be years before the same funding package can be re-assembled.

Both UCM's mortgage commitment and its section 8 funding from HUD are contingent upon its ability to receive the necessary zoning approvals or waivers by June 30, 1995. Failing that, it will be unable to proceed with the closing scheduled for July 30, 1995. While there is nothing which prevents UCM from re-applying for HUD funding, such funds are typically allocated on a fiscal year basis, and further funding may not be available during the current fiscal year. Further, there is no guarantee that a subsequent application will be granted. UCM's initial request for HUD funding was turned down.

To summarize: if UCM cannot get past this barrier of zoning approval, it will lose all funding for the project; efforts to establish a long-term shelter will have to start from the beginning, and there are no guarantees of success. What all of this means to plaintiff Judy B. is that she will have no hope of improving her situation for a year at best—a loss to her not compensable in monetary damages.

The United States Court of Appeals for the Third Circuit has held, in a comparable case, that an action that jeopardizes the recovery process for recovering alcoholics and threatens to push them into relapse causes just the kind of irreparable harm that justifies preliminary injunctive relief. In *Sullivan v. City of Pittsburgh*, 811 F.2d 171, 179–80 (3d Cir.), *cert. denied*, 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104, (1987) the court stated: "plaintiffs-appellees are primarily recovering alcoholics who are in a critical stage of their recovery.... Without proper care, supervision and peer support each could easily suffer a relapse.... For these alcoholics, a relapse threatens not only a potentially irremediable reversion to chronic alcohol abuse but immediate physical harm or death. The record reflects that alcoholics who had been denied treatment at the Center were unable to end their alcohol abuse and suffered severe injury or death as a result ... and it is clear that [the centers' managers] provide[ ] the only treatment available for appellees.... Indeed, it is difficult to conceive of many facts which would more compellingly argue for appellees' relief." See also: *Oxford–Cherry Hill*, 799 F.Supp. at 463–64 (Evidence showing that a failure to issue an injunction would substantially increase the likelihood of relapse for recovering alcoholics and addicts demonstrates irreparable harm.)

### Balancing of the equities

A balancing of the equities supports issuance of the injunction. As we discussed above, if the injunction does not issue, UCM will lose funding for the project, and will have to begin anew its efforts to establish a long-term shelter. The toll that this will take on the life of plaintiff Judy B. and others like her is incalculable. Her life will remain on hold until such facilities are made available to her.

All of that is balanced against no conceivable harm to the borough or its residents if the project is allowed to go forward as proposed. Defendants presented no testimony suggesting that the shelter or its future resi-

dents will disrupt the lives or activities of neighboring property owners, will cause greater fiscal expenditures or have any negative impact whatsoever on the community.

### Public Interest

Issuance of the injunction is consistent with the public interest in bettering the lives of the handicapped and allowing them to live lives on a footing equal to the non-handicapped, policies endorsed by Congress with passage of the FHAA, section 504 of the rehabilitation act, and comparable legislation intended to remove impediments to the handicapped enjoying the same rights and privileges as all other citizens. See: *Instant Air Freight*, 882 F.2d at 803 (legislative expressions of public policy through statutes may be relied on to define "public interest" for purposes of preliminary injunction analysis).

We note, parenthetically, that the Tioga Borough Zoning Code itself acknowledges the importance of the public interest in providing adequate housing for its citizenry. It lists among its objectives ensuring "to the citizens of Tioga Borough the maximum possible decent housing ... [and] good community services." (Record document no. 24, exhibit "A", § 165-4(A)(4).

Accordingly, we hold that the public interest factor weighs in favor of granting plaintiffs the injunctive relief which they seek.

### Maintenance of the status quo

Issuance of the injunction will not disturb the status quo of the neighborhood. While it will obviously result in a change in current circumstances, i.e. UCM will be able to proceed with the closing, renovate the property, and convert it into a shelter, that change will not disturb or alter the character of the surrounding neighborhood.

### Defendants' motion to dismiss

Defendants move to dismiss plaintiffs' complaint on the ground that the existence of the variance procedure, of which UCM has availed itself is, by itself, the only "reasonable accommodation" required by the FHAA. This court does not agree. As UCM's experience proves, an applicant for a variance is not guaranteed success. The procedure does nothing more than provide property owners with a mechanism whereby they can seek permission to vary the permitted use.

A similar argument was soundly rejected by the United States District Court for New Jersey in *Oxford–Cherry Hill*, 799 F.Supp. at 462 n. 25, with the court stating:

'Reasonable accommodation' means changing some rule that is generally applicable to everyone so as to make its burden less onerous on the handicapped individual. Thus, where everyone is provided with 'equal access' to a building in the form of a staircase, reasonable accommodation to those in wheelchairs may require building a ramp.

*Id.*

Moreover, the reality is that the procedure is just that, nothing more. All that it guarantees the applicant is an opportunity to be heard and to receive a ruling from the zoning hearing board. The desired result is not guaranteed.

### CONCLUSIONS OF LAW

1. Federal jurisdiction exists on the basis of 28 U.S.C. § 1331 and 1343.

2. Venue in this district is proper, since all parties reside or are located here.

3. Individuals with a physical or mental impairment that substantially limits one or more major life activities are handicapped within the meaning of the FHAA.

4. Plaintiff Debra T. is a handicapped person within the meaning of the FHAA, 42 U.S.C. § 3602(h) and an "aggrieved person" within the meaning of the FHAA, 42 U.S.C. § 3602(i), and is, on that basis, entitled to invoke its protections.

5. Plaintiff Judy B. is a handicapped person within the meaning of the FHAA, 42 U.S.C. § 3602(h) and an "aggrieved person" within the meaning of the FHAA, 42 U.S.C. § 3602(i), and is, on that basis, entitled to invoke its protections.

6. The proposed use of the motel, if purchased by UCM, is as a multiple dwelling unit.

7. The Tioga Borough zoning ordinance is subject to the FHAA "reasonable accommodation" requirement.

8. Injunctive relief is available to plaintiffs under the FHAA, 42 U.S.C. § 3613(c).

9. Plaintiffs have been discriminated against within the meaning of the FHA, 42 U.S.C. § 3604(f), due to the borough's failure to make reasonable accommodations in its rules, policies, or practices to allow conversion of the motel into an SRO residence.

10. Allowing the proposed use will neither impose "undue financial and administrative burdens" on the borough or any individual or entity, nor will it require a "fundamental alteration in the nature of" the borough zoning scheme.

11. UCM's proposed use of the motel as an SRO residence is consistent with the character of the surrounding neighborhood and with the overall zoning scheme and stated planning goals of the borough and is compatible with the other uses specifically permitted in the CI District.

12. The use proposed by UCM is one sufficiently similar in character to the others expressly permitted within the CI District where it is located, such that deeming it to be a permitted use under the "other uses—similar in character" category established by the local zoning ordinance constitutes a reasonable accommodation under the FHAA.

13. Plaintiff Judy B. will suffer irreparable harm not compensable in monetary damages if the requested injunctive relief is denied.

14. A balancing of the equities favors issuing the injunction.

15. The public interest will be served by issuing the injunction.

16. Issuing the injunction to permit the proposed use will not alter the status quo of the surrounding neighborhood.

**Security requirement**

Normally, the applicant for a preliminary injunction must post security before the injunction may issue.

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained....

Fed.R.Civ.P. 65(c).

Under the circumstances of this case, the court will exercise its discretion, and require no bond from these plaintiffs based upon the following: 1) there is no evidence that the defendants will suffer any adverse financial impact if the proposed use is permitted and the motel converted into a residential facility; 2) plaintiff Judy B. has been a resident of the Osceola shelter for the past three years and has not been gainfully employed during that period; 3) plaintiff Debra T. only recently moved out of the Osceola shelter after completing a residential rehabilitation program for alcoholics; 4) plaintiffs are represented in this matter by a public law project; and 5) based on their circumstances, we infer that neither plaintiff has significant financial resources and would, therefore, lack the ability to post security. See, e.g., *Cohen v. Coahoma County, Miss.,* 805 F.Supp. 398, 408 (N.D.Miss.1992); *Haitian Centers Council, Inc. v. McNary,* 789 F.Supp. 541, 548 (E.D.N.Y.1992).

**Nature of relief**

Only one obstacle was brought to the court's attention as a barrier to the issuance of a building permit by the Borough Zoning Enforcement Officer: inconsistency of the proposed use with borough zoning use restrictions and the need to obtain a variance because of that inconsistency. This court's finding that the waiver of such restrictions is required under federal law as a reasonable accommodation eliminates that barrier. There is, therefore, based on the information which we have before us, no longer any obstacle to issuance of a building permit.

We will, therefore, direct that a building permit issue within five business days from the date of this memorandum and the accompanying order, on the basis of the application filed by UCM February 25, 1994.

\*　　\*　　\*　　\*　　\*　　\*

An order will issue consistent with this memorandum.

## ORDER

For the reasons stated in the accompanying memorandum, **IT IS ORDERED THAT:**

1. Defendants' motion to dismiss the complaint (record document no. 16) is denied.

2. Plaintiffs' motion for a preliminary injunction (record document no. 7) is granted.

3. Defendants, their agents and employees are enjoined from refusing to permit plaintiff Judy B. to reside at the facility located at Two Berry Street in the Borough of Tioga formerly known as the Seven Dwarfs Motel, or refusing to permit United Christian Ministries from establishing and operating that facility as a single room occupancy residence (SRO residence) for 15 disabled individuals, on the grounds that it is inconsistent with Tioga Borough Zoning Ordinance use requirements.

4. The Borough of Tioga is directed to issue, or to direct the appropriate borough official or employee to issue, within 5 business days from the date of this order a building permit to UCM to allow conversion of the motel into an SRO residence, as proposed in the application filed February 25, 1994.

5. Plaintiffs are not required to give security for issuance of this injunction. Fed. R.Civ.P. 65(c).

6. This order will remain in effect until countermanded by a subsequent order of this court or reversed or vacated on appeal.

7. A scheduling order will issue separately.

8. The clerk is directed to fax a copy of this order to counsel today.